UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**14 CV 5719**

-----------------------------------------x

FASHION G5 LLC,

        Plaintiff,

JUDGE WOODS

-against-

ALUC MARK ANSTALT, G.MARK
INTERNATIONAL LIMITED and
BORRELLI LTD,

        Defendants.

-----------------------------------------x

Case No. 14 CIV _____ (___)

COMPLAINT
AND JURY DEMAND

RECEIVED JUL 25 2014 U.S.D.C. S.D.N.Y.

Plaintiff Fashion G5 LLC ("FG5"), through its attorneys MATALON ♦ SHWEKY ♦ ELMAN PLLC, complaining of defendants, alleges:

## NATURE OF THE ACTION

1. This is an action to permanently enjoin defendants from any transfer of the famous LUIGI BORRELLI® trademark ("Mark") in violation of plaintiff's right of first refusal ("ROFR") to acquire the Mark. Relatedly, and in an effort to defeat plaintiff's rights, defendant G.Mark Internationa (which granted an exclusive license to plaintiff throughout North America), has pretextually claimed that plaintiff is in default of the license. Accordingly, plaintiff seeks a declaration that it is not in default

## JURISDICTION AND VENUE

2. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that this is a civil action between a citizen of a state and citizens or subjects of foreign states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

1

3. Venue is proper in this district under (i) 28 U.S.C. § 1391(b)(3), because defendants are subject to personal jurisdiction in this judicial district, and under (ii) 28 U.S.C. § 1391(c)(3), because neither defendant is resident in the United States.

## PARTIES

4. Plaintiff Fashion G5 LLC ("FG5") is a Delaware limited liability company with its principal place of business in New York. All members of the company are citizens and residents of New York.

5. Upon information and belief, defendant Aluc Mark Anstalt ("Aluc") is a company formed under the laws of Lichtenstein.

6. Upon information and belief, defendant G.Mark International Ltd. is a corporation formed under the laws of Ireland.

7. Upon information and belief, Borrelli Ltd. is a corporation formed under the laws of the United Kingdom.

## FACTS

### The License And ROFR Agreement

8. Effective July 1, 2011, G.Mark and FG5 entered into a Licensing Agreement (the "License"). Under the License, G.Mark granted FG5 an exclusive license to use the Mark and its variations throughout the Territory. The initial term of the license goes through December 31, 2021, and FG5 has the unilateral right to renew the license for an additional ten years if it is operating five retail stores before the initial term expires.

9. The rights under the license agreement are essential to FG5's business, given its sole purpose is to sell and distribute products bearing the Mark through its own retail stores and

third-party channels. Therefore, FG5 insisted on certain representations, warranties, guarantees and assurances from Aluc, as owner of the Mark, as an inducement to entering into the License. That took the form of a letter agreement dated July 1, 2011, which was negotiated and executed contemporaneously with the License (the "ROFR Agreement").

10. In the ROFR Agreement, Aluc represented and warranted that it had granted G.Mark a worldwide and exclusive license for the Mark during the "entire 'Term' set forth in the attached agreement between G.Mark and Fashion FG5 LLC."

11. Aluc also guaranteed performance of the License, such that if "the G.Mark License terminates or otherwise reverts to Aluc during the term of the License Agreement . . . Aluc shall take over from G.Mark all of G. Mark's obligations and rights pursuant to said license agreement . . . and for the duration of the term . . . Aluc shall honour all of the obligations of G.Mark provided by such agreement as if Aluc was the 'Licensor' pursuant to said Agreement, which Agreement shall remain in full force and effect."

12. Finally, and central to this dispute, Aluc granted FG5 a right of first refusal if Aluc wanted to sell or transfer the Mark in whole or in part. The ROFR Agreement provides:

> Aluc Mark Anstalt hereby agrees that in the event that it decides to sell or otherwise transfer the Trademark in whole or in part (including, without limitation, by way of a sale of its assets or of its underlying shares or membership interests, as the case may be), then in each case, prior to the consummation of any such transaction, Aluc shall inform [FG5] in writing of its intention and prior to entering into any such Transaction with any third party (each a "Third Party Agreement"), Aluc shall provide [FG5] with a *written agreement* containing *all of the terms* of such Third Party Agreement and [FG5] shall have the right, but not the obligation, to enter into such agreement, provided further that in the event that [FG5] does not *execute such agreement* within 60 days after its receipt (subject to any further negotiations between the parties in good faith), Aluc shall have the right to enter in such Third Party Agreement on the same terms and shall

3

not offer any Third Party any terms more favorable without first re-submitting such terms to [FG5] for its further consideration.

**Defendants' First Attempt To Defeat The ROFR**

13. Without prior notice or discussion, on March 28, 2014, Aluc informed FG5 that it "received an offer to sell, transfer and assign" the Mark to an unidentified buyer (the "March 28 Letter"). The letter enclosed an unsigned "DEAL MEMO" with six points, and concluded with the threat that if FG5 did not respond "within 15 days as of the receipt of this letter, we will infer that you are not interested in purchasing the Mark and we will feel free to transfer the same."

14. The March 28 Letter was inadequate to commence the ROFR process. Aluc had failed to provide an "agreement" that FG5 could "execute," but merely a "Deal Memo" outlining some points in a potential transaction. Indeed, the Deal Memo plainly failed to provide *all* of the terms of the Third Party Agreement, as required by the ROFR Agreement. And of course, the 15-day deadline arbitrarily imposed by Aluc cut the consideration period to one-quarter of the minimum, contractual requirement.

15. FG5 was nonetheless interested in purchasing the Mark, and expressed such interest in its March 31, 2014 response. FG5 noted, however, that "before [F]G5 can even consider such a transaction, it must receive proper notice, including a full and complete copy of the Third Party Agreement, in accordance with the procedure detailed in the [ROFR Agreement]."

**Defendants' Second Attempt To Defeat The ROFR**

16. Six weeks later, Aluc again tried (but failed) to trigger the ROFR. By letter dated May 14, 2014, Aluc claimed to have received a "formal offer" from Borrelli Ltd, an entity formed for the transaction, which contained an "outline" of terms and conditions for a

"transfer/purchase." The Borrelli Ltd. offer expressly referred two other agreements, neither of which had been negotiated: (a) a "transfer agreement" which "shall be in Italian language and governed by Italian law"; and (b) an employment agreement with Fabio Borrelli for a minimum of 10 years that gave him "wide powers for the operational management of the Mark."

17. Not only did forwarding the "offer" from Borrelli Ltd. fail to satisfy the ROFR Agreement requirement that an agreement in executable form be provided to FG5, but it violated the requirement that "all" of the terms of the agreement with the third-party be disclosed. Here, no final agreement had even been reached between the Aluc and Borrelli Ltd. Accordingly, Aluc's May 14 notice did not trigger the ROFR or permit a sale to Borrelli Ltd. consistent with the ROFR Agreement.

**Defendants' Bad Faith Inclusion Of "Poison Pills"**

18. Apart from those deficiencies, the Borelli Ltd. offer was clearly the product of a collusive effort between Aluc and Borrelli Ltd. to deter FG5 from exercising the ROFR and steer the transaction to Borrelli Ltd. Specifically, the "offer" contained a series of terms which they knew would be repugnant to FG5. First, it provided for the employment of Fabio Borrelli, a principal of Aluc, giving him *"absolute and unequivocal dealership"* over virtually all aspects of the Mark, including:

> Advertising: availability for interviews in the papers, TV, internet; approval of the catalogues for any kind of support, on paper or online; supervision and approval on web site, e-commerce and products to sale through e-commerce; supervision and approval for marketing and advertising plan, to both commercial vehicles and budget to apply.

> Distribution: *supervision and approval of the locations* (street, town, country) in order to open Flagship store; supervision and *approval for*

> *importers*, import structures, *prices*, and business agents to whom the collections will be consigned.
>
> Collections: *unconditional power to decide and to select the materials* to be used for the collections, the *suppliers* for the manufacture of the product, the *licensees* for the products distribution, the *prices of each* product and more in general the price list.

Accordingly, the provisions of the anticipated employment agreement with Fabio Borrelli would give him practically unfettered control over the Mark even after Aluc purported to sell it to a third party.

19. Next, the offer stated:

> Borrelli Ltd shall be obliged to open a local unity in Italy, Milan, for the set-up and management of the showroom, having one person employed to carry out the services.

20. Finally, the offer contained a provision requiring that disputes be submitted to a court in Milan and decided under Italian law, even though none of the parties to this dispute reside in Italy.

21. Defendants knew that FG5 had no interest in purchasing the Mark for 9.75 million Euro (more than $13 million) while at the same time committing to give an outsider "the absolute and unequivocal" management of the company. They also knew that a New York-based company would not be enthusiastic about the supposed requirement of a Milan showroom, and the requirement to litigate in Italy. Nor can any such provisions be for the benefit of the entity Aluc, as they are completely irrelevant to the sale and transfer of the Mark itself.

22. Aluc's May 14 letter concluded by requiring the exercise of the "pre-emption right" (ROFR) within 60 days, "offering the same terms and conditions we received by Borrelli Ltd."

### The Parties Dispute Whether The ROFR Was Triggered

23. On May 22, 2014, FG5 responded in writing, confirming its interest in the purchase of the Mark, but maintaining that the May 14 letter still did not trigger the 60 day review period under the ROFR Agreement.

24. Aluc responded on June 3 asserting the offer had enough detail to enable FG5 to "concretely decide whether to exercise" the ROFR. The letter concluded with the assertion that the 60 day period started on May 14, and that if the ROFR was not exercised within "60 days of that date," Aluc would be free to sell the Mark to Borrelli Ltd.

### Plaintiff Exercises The ROFR

25. On July 9, 2014, while preserving its right to claim that it had no obligation to exercise the ROFR, FG5 sought to exercise the ROFR by submitting a signed letter of intent to Aluc and its attorneys. FG5 matched the Borrelli Ltd. offer in all material respects with regard to the transfer of the Mark, including the price, the timing of payment, and security. The offer, however, did not commit to giving Fabio Borrelli complete control over the operations of the company or the Mark, stating instead that FG5 would negotiate an appropriate employment agreement with him (but that conclusion of such an agreement was not a prerequisite to purchase of the Mark). Similarly, FG5 stated its intention to open a showroom in a fashion capital such as Milan, Paris or New York. FG5 also proposed the application of New York law and a New York forum, consistent with the License itself.

### Aluc Rejects The Exercise Of The ROFR In Bad Faith

26. The ROFR Agreement provided that the 60-day period was "*subject to any further negotiations between the parties in good faith.*" However, without engaging in any further

7

negotiations, on July 14, 2014 Aluc conclusively rejected plaintiff's exercise of the ROFR, stating through counsel that "for the umpteenth and final time, I repeat that ALUC is not interested in operations that differ, even in part, from that proposed by BORRELLI Ltd."

**Aluc Accepts The Borrelli Ltd. Offer**

27. On July 15, the very next day after the ROFR period allegedly expired, Aluc advised Borrelli Ltd. that there was a "failure to exercise pre-emption right by [FG5]." (Exhibit L hereto) Aluc then accepted the Borrelli Ltd. offer, thereby committing to proceed with the sale of the Mark to Borrelli Ltd.

## COUNT I
### (Breach of Contract)

28. FG5 repeats and realleges the foregoing allegations as if set forth in full here.

29. The ROFR Agreement is a valid and binding contract.

30. The ROFR provides that in the event that Aluc decides to sell or transfer the Mark, "prior to entering into any such Transaction with any third party . . . Aluc shall provide [FG5] with a written agreement containing all of the terms of such Third Party Agreement," which FG5 can elect to "execute" within 60 days after its receipt "(subject to any further negotiations between the parties in good faith)."

31. Aluc never provided FG5 "with a written agreement containing all of the terms of such Third Party Agreement," despite repeated requests by FG5.

32. Thus, Aluc had no right to sell the Mark to a third-party, because FG5's rights under the ROFR Agreement were still intact.

33. FG5 performed its obligations under the ROFR Agreement.

8

34. Aluc breached the ROFR Agreement by accepting a binding offer to purchase the Mark from Borrelli Ltd.

35. As a result of Aluc's breaches, FG5 has suffered and will continue to suffer irreparable injury for which money damages will be inadequate.

## COUNT II
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

36. FG5 repeats and realleges the foregoing allegations as if fully set forth herein.

37. The May 14, 2014 letter, which contained a "binding offer" from Borrelli Ltd., included "poison pill" provisions, designed to deter FG5's exercise of the ROFR.

38. Aluc's negotiation and inclusion of such terms in the offer were done in bad faith, for the purposes of depriving plaintiff of its ROFR.

39. Accordingly, Aluc breached the covenant of good faith and fair dealing.

40. Similarly, Aluc was contractually bound to extend the 60-day period to account for further good faith negotiations between the parties. After receiving FG5's offer which substantially and materially matched the Borrelli Ltd offer, Aluc promptly rejected it and refused to continue negotiations.

41. As a result of Aluc's breaches of the covenant of good faith and fair dealing, FG5 has suffered and will continue to suffer irreparable injury for which money damages will be inadequate.

## COUNT III
### (Permanent Injunction)

42. FG5 repeats and realleges the foregoing allegations as if fully set forth herein.

43. On July 15, 2014, Aluc accepted a binding offer to purchase the Mark from Borrelli

Ltd.

44. Aluc intends to complete the sale of the Mark to Borrelli Ltd. without providing FG5 with a proper opportunity to exercise the ROFR.

45. FG5 does not have an adequate remedy at law. Accordingly, defendants should be permanently enjoined from a transfer of the Mark without complying with the ROFR Agreement.

## COUNT IV
### (Specific Performance)

46. FG5 repeats and realleges the foregoing allegations as if fully set forth herein.

47. Aluc has failed to act in accordance with the terms of the ROFR Agreement.

48. FG5 is entitled to specific performance of the ROFR Agreement in accordance with the July 9, 2014 offer submitted by FG5.

49. FG5 has no adequate remedy at law.

## COUNT V
### (Declaratory Judgment Against G.Mark)

50. FG5 repeats and realleges the foregoing allegations as if fully set forth herein.

51. On or about March 28, 2014 and May 14, 2014 – the date on which Aluc sent notice of its intent to transfer the Mark to Borrelli Ltd. – G.Mark sent FG5 notices of default under the License. The notices were pre-textual, intended to put additional pressure on FG5 not to exercise its ROFR.

52. Moreover, the License provided FG5 sixty days in which to cure any alleged breach. All of the alleged breaches have been cured.

53. There is an actual, present and justiciable controversy between FG5 and G.Mark as

to whether plaintiff is in default of the License.

54. By reason of the foregoing, FG5 is entitled to a declaratory judgment under 28 U.S.C. § 2201(a) declaring that it is not in breach of the License.

## COUNT VI
### (Tortious Interference Against Borrelli Ltd.)

55. FG5 repeats and realleges the foregoing allegations as if fully set forth herein.

56. Borrelli Ltd. was aware of Aluc's contractual obligation under the ROFR Agreement to grant FG5 a right of first refusal. In the Borrelli Ltd. offer, Aluc and Borrelli Ltd. agreed that the transfer of the Mark was conditioned upon FG5 not exercising its ROFR.

57. Borrelli Ltd., in making an offer to purchase the Mark, colluded with Aluc to include in its offer "poison pill" provisions, designed to frustrate FG5's attempts to exercise the ROFR.

58. Borrelli Ltd.'s negotiation and inclusion of such terms in the agreement were done for the purposes of defeating the ROFR, and resulted in Aluc's breach of the ROFR Agreement and the covenant of good faith and fair dealing.

59. As a result of Borrelli Ltd.'s negotiations with Aluc and the offer it made to Aluc, Aluc breached its contractual obligations under the explicit terms of the ROFR Agreement and the implied covenant of good faith and fair dealing therein.

60. Due to Borrelli Ltd.'s interference with the contractual relationship between Aluc and FG5, FG5 has suffered and will continue to suffer irreparable injury for which money damages will be inadequate.

**WHEREFORE**, Plaintiff FG5 requests judgment as follows:

A. On COUNTS I, II and III and VI, granting a permanent injunction enjoining the transfer of the Mark without defendants' compliance with the ROFR Agreement.

B. On COUNT IV, ordering defendant Aluc to specifically perform the ROFR Agreement in accordance with the July 9, 2014 offer submitted by plaintiff.

C. On COUNT V, entering a declaratory judgment against G.Mark under 28 U.S.C. § 2201 adjudging, declaring, and decreeing that FG5 is not in breach of the License.

D. On all COUNTS, granting FG5 such other and further relief as the Court deems just and proper including costs, expenses and attorneys' fees.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff demands trial by jury in this action of all issues so triable.

MATALON ♦ SHWEKY ♦ ELMAN PLLC

By: Joseph Lee Matalon
450 Seventh Avenue, 33rd Floor
New York, NY 10123
(212) 244-9000
*Attorneys for Plaintiff*

Dated: July 25, 2014