MATALON ♦ SHWEKY ♦ ELMAN PLLC
450 Seventh Avenue, 33rd Floor
New York, New York 10123
Tel: (212) 244-9000
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                :
**FASHION G5 LLC,**                                             :
                                                                :    **Case No. 14 CIV 5719 (GHW)**
              **Plaintiff,**                                    :
                                                                :
       -against-                                                :
                                                                :    **AMENDED COMPLAINT**
**ALUC MARK ANSTALT, G. MARK**                                 :
**INTERNATIONAL LIMITED, and**                                 :
**BORRELLI LTD.,**                                              :
                                                                :
              **Defendants.**                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff Fashion G5 LLC ("FG5"), through its attorneys MATALON ♦

SHWEKY ♦ ELMAN PLLC, complaining of defendants, alleges:

**NATURE OF THE ACTION**

1.      This is an action to permanently enjoin defendants from any further transfer of the

famous LUIGI BORRELLI® trademark ("Mark") in violation of plaintiff's right of first refusal

("ROFR") to acquire the Mark, and to compel defendants to sell the Mark to plaintiff on the

same terms and conditions as stated in the "Scrittura Privata Cessione Di Marchio," dated July

23, 2014.  Additionally, Aluc and defendant G.Mark International Limited ("G.Mark") (which

granted an exclusive license to plaintiff throughout North America), have breached the parties'

Licensing Agreement ("License"), by requiring plaintiff to comply with payment terms that are

less favorable than those offered to G.Mark's other licensees and by withholding shipment of merchandise.  G.Mark further breached the License by permitting other entities to use plaintiff's exclusive license in the United States.  Accordingly, plaintiff seeks damages and other relief from G.Mark and Aluc in the amount to be determined by the Court.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity jurisdiction), in that this is a civil action between a citizen of a state and citizens or subjects of foreign states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

3.      The Court has personal jurisdiction over all three defendants as a result of the forum-selection clause contained in the License, which binds each defendant in the circumstances herein.

4.      Moreover, upon information and belief, Borrelli Ltd. is a successor-in-interest to Aluc Mark Anstalt ("Aluc") and G.Mark, and all three are alter-egos of each other.

5.      Venue is proper in this district under (i) 28 U.S.C. § 1391(b)(3), because defendants are subject to personal jurisdiction in this judicial district, and under (ii) 28 U.S.C. § 1391(c)(3), because neither defendant is resident in the United States.

## PARTIES

6.      Plaintiff Fashion G5 LLC ("FG5") is a Delaware limited liability company with its principal place of business in New York.  All members of the company are citizens and residents of New York.

7.      Upon information and belief, defendant Aluc is a company formed under the laws

2

of Lichtenstein.

8.     Upon information and belief, defendant G.Mark is a corporation formed under the laws of Ireland.

9.     Upon information and belief, Borrelli Ltd. is a corporation formed under the laws of the United Kingdom.

## FACTS

### The License And ROFR Agreement

10.     Effective July 1, 2011, G.Mark and FG5 entered into the License. Under the License, G.Mark granted FG5 an exclusive license to use the Mark and its variations throughout the Territory.

11.     The initial term of the License goes through December 31, 2021, and FG5 has the unilateral right to renew the License for an additional ten years if it is operating five retail stores before the initial term expires.

12.     The rights under the License are essential to FG5's business, given its sole purpose is to sell and distribute products bearing the Mark through its own retail stores and third-party channels.  Therefore, FG5 insisted on certain representations, warranties, guarantees and assurances from Aluc, as owner of the Mark, as an inducement to entering into the License. That took the form of a letter agreement dated July 1, 2011, which was negotiated and executed contemporaneously with the License (the "ROFR Agreement").

13.     In the ROFR Agreement, Aluc represented and warranted that it had granted G.Mark a worldwide and exclusive license for the Mark during the "entire 'Term' set forth in the attached agreement between G.Mark and Fashion FG5 LLC."

3

14.    Aluc also guaranteed performance of the License, such that if "the G.Mark License terminates or otherwise reverts to Aluc during the term of the License Agreement . . . Aluc shall take over from G.Mark  all of G.Mark's obligations and rights pursuant to said license agreement . . . and for the duration of the term . . . Aluc shall honour all of the obligations of G.Mark provided by such agreement as if Aluc was the 'Licensor' pursuant to said Agreement, which Agreement shall remain in full force and effect."

15.    Finally, and central to this dispute, Aluc granted FG5 a right of first refusal ("ROFR") if Aluc wanted to sell or transfer the Mark in whole or in part.  The ROFR Agreement provides:

> Aluc Mark Anstalt hereby agrees that in the event that it decides to sell or otherwise transfer the Trademark in whole or in part (including, without limitation, by way of a sale of its assets or of its underlying shares or membership interests, as the case may be), then in each case, prior to the consummation of any such transaction, Aluc shall inform [FG5] in writing of its intention and prior to entering into any such Transaction with any third party (each a "Third Party Agreement"), Aluc shall provide [FG5] with a *written agreement* containing *all of the terms* of such Third Party Agreement and [FG5] shall have the right, but not the obligation, to enter into such agreement, provided further that in the event that [FG5] does not *execute such agreement* within 60 days after its receipt (subject to any further negotiations between the parties in good faith), Aluc shall have the right to enter in such Third Party Agreement on the same terms and *shall not offer any Third Party any terms more favorable without first re-submitting such terms to [FG5] for its further consideration.*  (Emphasis added)

**Defendants' First Attempt To Defeat The ROFR**

16.    Without prior notice or discussion, on March 28, 2014, Aluc informed FG5 that it "received an offer to sell, transfer and assign" the Mark to an unidentified buyer (the "March 28 Letter").  The letter enclosed an unsigned "DEAL MEMO" with six points, and concluded with the threat that if FG5 did not respond "within 15 days as of the receipt of this letter, we will infer that you are not interested in purchasing the Mark and we will feel free to transfer the

4

same."

17.    The March 28 Letter was inadequate to commence the ROFR process.  Aluc had

failed to provide an "agreement" that FG5 could "execute," but merely a "Deal Memo"

outlining some points in a potential transaction.  Indeed, the Deal Memo plainly failed to

provide *all* of the terms of the Third Party Agreement, as required by the ROFR Agreement.

And of course, the 15-day deadline arbitrarily imposed by Aluc cut the consideration period to

one-quarter of the minimum contractual requirement.

18.    FG5 was nonetheless interested in purchasing the Mark, and expressed such interest

in its March 31, 2014 response.  FG5 noted, however, that "before [F]G5 can even consider

such a transaction, it must receive proper notice, including a full and complete copy of the Third

Party Agreement, in accordance with the procedure detailed in the [ROFR Agreement]."

**Defendants' Second Attempt To Defeat The ROFR**

19.    Six weeks later, Aluc again tried (but failed) to trigger the ROFR.  By letter dated

May 14, 2014, Aluc claimed to have received a "formal offer" from Borrelli Ltd, an entity

formed for the transaction, which contained an "outline" of terms and conditions for a

"transfer/purchase."  The Borrelli Ltd. offer expressly referred to at least two other agreements,

neither of which had been negotiated: (i) a "transfer agreement" which "shall be in Italian

language and governed by Italian law"; and (ii) an employment agreement with Fabio Borrelli

for a "period not shorter than 10 years," which gave him "wide powers for the operational

management of the Mark."

20.    Not only did forwarding the "offer" from Borrelli Ltd. fail to satisfy the ROFR

Agreement requirement that an "agreement" in executable form be provided to FG5, but it

violated the requirement that "all" of the terms of the agreement with the third party be disclosed.  Here, no final agreement had even been reached between the Aluc and Borrelli Ltd. as of May 14.  Accordingly, Aluc's May 14 notice did not trigger the ROFR or permit a sale to Borrelli Ltd. consistent with the ROFR Agreement.

**Defendants' Bad Faith Inclusion Of "Poison Pills"**

21.    Apart from those deficiencies, the Borelli Ltd. offer was clearly the product of a collusive effort between Aluc and Borrelli Ltd. to deter FG5 from exercising the ROFR and steer the transaction to Borrelli Ltd.  Specifically, the "offer" contained a series of terms which they knew would be repugnant to FG5.  Most significant,  the offer provided for the employment by Borrelli Ltd. of  Fabio Borrelli, a principal of Aluc, for a "period not shorter than 10 years," giving him "*absolute and unequivocal dealership*" over virtually all aspects of the Mark, including:

> Advertising:  availability for interviews in the papers, TV, internet; approval of the catalogues for any kind of support, on paper or online; supervision and approval on web site, e-commerce and products to sale through e-commerce; supervision and approval for marketing and advertising plan, to both commercial vehicles and budget to apply.

> Distribution:  *supervision and approval of the locations* (street, town, country) in order to open Flagship store; supervision and *approval for importers*, import structures, *prices*, and business agents to whom the collections will be consigned.

> Collections:  *unconditional power to decide and to select the materials* to be used for the collections, the *suppliers* for the manufacture of the product, the *licensees* for the products distribution, the *prices of each* product and more in general the price list.

Accordingly, the provisions of the anticipated employment agreement with Fabio Borrelli would give him practically unfettered control over the Mark even after Aluc purported to sell it to a third party.

22.    Next, the offer stated:

6

Borrelli Ltd shall be obliged to open a local unity in Italy, Milan, for the set-up and management of the showroom, having one person employed to carry out the services.

23.     Finally, the offer contained a provision requiring that disputes be submitted to a court in Milan and decided under Italian law, even though none of the parties to this dispute reside in Italy.

24.     Defendants knew that FG5 had no interest in purchasing the Mark for €9.75 million (more than $13 million) while at the same time committing to give an outsider "the absolute and unequivocal" management of the company.  They also knew that a New York-based company would not be enthusiastic about the supposed requirement of a Milan showroom, and the requirement to litigate in Italy.  Nor can any such provisions be for the benefit of the entity Aluc, as they are completely irrelevant to the sale and transfer of the Mark itself.

25.     Aluc's May 14 letter concluded by requiring the exercise of the "pre-emption right" (ROFR) within 60 days, "offering the same terms and conditions we received by Borrelli Ltd."

**The Parties Dispute Whether The ROFR Was Triggered**

26.     On May 22, 2014, FG5 responded in writing, confirming its interest in the purchase of the Mark, but maintaining that the May 14 letter still did not trigger the 60 day review period under the ROFR Agreement.

27.     Aluc responded on June 3 asserting the offer had enough detail to enable FG5 to "concretely decide whether to exercise" the ROFR.   The letter concluded with the assertion that the 60 day period started on May 14, and that if the ROFR was not exercised within "60 days of that date," Aluc would be free to sell the Mark to Borrelli Ltd.

**Plaintiff Exercises The ROFR**

28.     On July 9, 2014, while preserving its right to claim that it had no obligation to

7

exercise the ROFR, FG5 sought to exercise the ROFR by submitting a signed letter of intent to Aluc and its attorneys.  FG5 matched the Borrelli Ltd. offer in all material respects with regard to the transfer of the Mark, including the price, the timing of payment, and security. For example, FG5 offered to pay the first installment upon execution of the letter of intent, and to have that money held in escrow.  The offer, however, did not commit to giving Fabio Borrelli a 10 year employment agreement and a complete control over the operations of the company or the Mark, stating instead that FG5would negotiate an appropriate employment agreement with Mr. Borrelli (but that conclusion of such an agreement was not a prerequisite to purchase of the Mark).  Similarly, FG5 stated its intention to open a showroom in a fashion capital such as Milan, Paris or New York.  FG5 also proposed the application of New York law and a New York forum, consistent with the License itself.

**Aluc Rejects The Exercise Of The ROFR In Bad Faith**

29.   The ROFR Agreement provided that the 60-day period was "*subject to any further negotiations between the parties in good faith*."   However, without engaging in any further negotiations, on July 14, 2014 Aluc conclusively rejected plaintiff's exercise of the ROFR, stating through counsel that "for the umpteenth and final time, I repeat that ALUC is not interested in operations that differ, even in part, from that proposed by BORRELLI Ltd."

30.   Aluc purported to reject FG5's letter of intent on the following four grounds.

a) the first payment equal to Euro 292,500 is an earnest and you can not [sic] be assumed to negotiate an escrow agreement;

b) there is not a requirement to open a showroom in Milan and the hiring of an employee, but only the mere intention to open it;

c) there is no obligation to enter into a contract with [Fabio Borrelli] under the conditions specified, but only a simple negotiation on terms to be agreed;

8

d) it provides for the application of the law of the State of NY and not the Italian one with exclusive jurisdiction of the Courts of Milan.

31.     None of the excuses identified in the foregoing paragraph were a valid basis for rejecting FG5's intent to exercise the ROFR.

**Aluc Accepts The Borrelli Ltd. Offer**

32.     On July 15, the very next day after the ROFR period allegedly expired, Aluc advised Borrelli Ltd. that there was a "failure to exercise pre-emption right by [FG5]."  Aluc then accepted the Borrelli Ltd. offer, thereby committing to proceed with the sale of the Mark to Borrelli Ltd.

33.     The offer required Borrelli Ltd. to make a €292,500 payment to Aluc upon Aluc's acceptance of its offer.  Upon information and belief, no such payment was ever made.

34.     The offer further required a second installment of €3 million upon the signing of the deed, but no later than December 30, 2014.

**The Court Enjoins Aluc And G.Mark From Transferring
The Mark Pending The Preliminary Injunction Hearing**

35.     On July 23, 2014, FG5 gave notice to defendants and their representatives that on July 25, 2014 it was going to file an action in this Court and submit a proposed order to show cause for a temporary restraining order ("TRO") and preliminary injunction, seeking to restrain the transfer of the Mark to Borrelli Ltd.

36.     At the July 25 hearing on FG5's motion for a TRO, during which all the defendants were represented by counsel, the Court held that FG5 established irreparable harm in the absence of a TRO and a likelihood of success on the merits, and granted FG5's request for a TRO, thereby temporarily restraining and enjoining Aluc and G.Mark from "selling, conveying

9

or transferring" the Mark.

**Defendants Execute The Deed Of Assignment**

37.     On July 30, 2014, five days after the Court entered the TRO, defendants disclosed for the first time that on July 23, 2014 – two days before the TRO hearing – Aluc and Borrelli Ltd. purportedly signed a transfer agreement, titled "Scrittura Privata Cessione Di Marchio" (the "Deed of Assignment").  Remarkably, no mention of the supposed execution of the Deed of Assignment was mentioned by defendants' counsel at the TRO hearing on July 25, 2014.

38.     Upon information and belief, Aluc and Borrelli Ltd. did *not* execute the Deed of Assignment until *after* the Court entered the TRO.

**The Deed of Assignment Conclusively Establishes**
**That Aluc Breached The ROFR Agreement**

39.     The Deed of Assignment and the related transaction documents conclusively establish that Aluc breached the ROFR Agreement in two material respects: (i) the Deed of Assignment contains terms that were not previously provided to FG5, which supports the point that FG5 had been making all along that it had not been provided with "all the terms" of its transaction with Borrelli Ltd.; and (ii) it shows that Aluc violated the ROFR Agreement by offering Borrelli Ltd. more favorable terms without first re-submitting them to FG5 for its further consideration.

40.     There are at least eight material differences between the Deed of Assignment and Borrelli Ltd.'s May 14 offer presented to FG5.

41.     First, the May 14 offer required Borrelli Ltd. to offer Fabio Borrelli an employment agreement "not shorter than 10 years" that granted "wide powers for the operational management of the Mark," including "absolute and unequivocal dealership" over advertising,

distribution and collections. That provision even served as the basis for Aluc's rejection of FG5's letter of intent. However, the actual employment agreement between Borrelli Ltd. and Mr. Borrelli may be terminated by either party on a mere two weeks' notice. Thus, it is nothing more than an at-will employment arrangement.

42.    Second, the actual employment gives Borrelli Ltd. a unilateral right "after consulting with" Mr. Borrelli, "to make changes to any of [his] terms and conditions of employment."  The agreement does not provide Mr. Borrelli with any recourse against the company for such "changes."  Thus, at any point, the company is permitted to strip Mr. Borrelli of his "wide powers" and assume direct management of the Mark.  At no prior time did any of the defendants suggest to FG5 that this could be a feature of Mr. Borrelli's employment agreement.

43.    Third, the Deed of Assignment itself is rife with additional (or modified), and more favorable, terms.  For example, the Deed of Assignment annexes a six page document listing all the registrations of the Mark and all of defendants' contractual agreements.

44.    Fourth, the Deed of Assignment further modifies the payment schedule and waives all payments that were required to be made prior to September 30, i.e., first installment (292,500 Euros) upon the acceptance of the offer and second installment (3 million Euros) upon the execution of the Deed. However, when FG5 offered to pay the first installment upon execution of the letter of intent, and have that money held in escrow, Aluc rejected FG5's offer as inconsistent with the terms of the May 14 offer.

45.    Fifth, in the Deed of Assignment Aluc represents and warrants that is transferring the Mark "free of any charges, burden and rights in favour of any third parties."  No such term

11

was offered to FG5.

46.   Sixth, Aluc also represents and warrants that there is "no outstanding or pending civil, administrative, tax or social security litigation and that, to the best of [its] knowledge, may create any economic prejudice to the owner of the Trade Mark." No such term was offered to FG5.

47.   Seventh, Aluc also "undertakes to collaborate with [Borrelli Ltd.] to enable [it] to manage and co-ordinate the process of transfer of title and the consequent organizational [sic], commercial and administrative acts."  Again, no such term was offered to FG5.

48.   Finally, the Deed of Assignment contained a clause addressing press releases, which was not included the offer to FG5.

**G.Mark's And Aluc's Breach Of The License**

49.   FG5's entire business is based upon its sublicense of the Mark.  After entering into the License, FG5 opened a LUIGI BORRELLI® retail store at 790 Madison Avenue in Manhattan.  The store is a mono-brand store, which means that it only stocks and sells LUIGI BORRELLI® products.

50.   The parties' course of dealing requires FG5 to place a single large purchase order for delivery of good for an entire selling season (e.g., summer, fall/winter). The order contains multiple categories of apparel, including Borrelli shirts, which are FG5's best sellers.

51.   Knowing full well that FG5's business depends on their timely fulfillment of its purchase orders, including the shipment of the famous Borrelli shirts, G.Mark and Aluc have caused the sole manufacturer to unilaterally alter its pricing, terms and conditions, and withhold shipments in violation of the License.

12

52.   The License requires G.Mark to ensure that Aluc and its authorized manufacturers provide FG5 merchandise on pricing, terms and conditions consistent with the prices, terms and condition offered to other licensees.  Specifically, the License states that:

> Licensor shall require Aluc and all other third parties manufacturing any of the Products to supply [FG5] with said Products on a sole and exclusive basis within the Territory . . . [G.Mark] undertakes to monitor that such prices, terms and conditions are consistent with the prices, terms and conditions applied by the above mentioned third parties to any other licensees of the Products.  (Section 2.3)

53.   After signing the License, the payment terms were unilaterally changed by the manufacturer with G.Mark's and Aluc's knowledge and consent.  Accordingly, FG5 was required to pay: (i) 30% of the purchase price immediately before shipment, (ii) 30%, 60 days after receiving the shipment, and (iii) the balance, 90 days after receiving the shipment.

54.   More recently, the payment terms were unilaterally changed again.  To receive goods, FG5 was required to pay 30% upon placement of the order, thus – several months in advance of shipment – rather than merely before shipment.  As a result, FG5 is now forced to pay for goods it will not receive and be able to sell for months.

55.   Upon information and belief, these payment terms are inconsistent – and less favorable – than the terms given to other licensees.  Upon information and belief, defendants have encouraged and required the manufacturer to demand these unfavorable and inconsistent terms.

56.   Defendants have also unilaterally altered and refused to fulfill portions of FG5 orders.

57.   For example, on January 17, 2014, FG5 placed an order for the 2014 Summer season, and requested confirmation that such merchandise will be manufactured.  No

confirmation was provided.  Instead, only about one-third of the merchandise ordered was ever shipped, and no Borrelli shirts were shipped at all.

58.    As a result of these practices, FG5's business has been slaughtered – its inventory of shirts and other merchandise is limited or completely depleted.  The store is virtually empty, and FG5 has been forced to try to sell prior year's leftovers.

59.    However, almost running FG5 out of business was not sufficient for defendants, as they now try to completely eviscerate FG5 by cancelling its April 18, 2014 order for the upcoming season.  Upon information and belief, that order was cancelled by defendants and no new merchandise is scheduled to be delivered to the store.  As a result, FG5 will once again not be able to offer the current season of merchandise to customers, and its already inadequate supply of merchandise will become nonexistent.

60.    The shortages in inventory has had an obvious disastrous impact on FG5's business, as customers purchasing a high-end brand expect to buy the latest season's products and to find merchandise in their sizes.  Upon information and belief, defendants hope that the failure to provide all the merchandise ordered will eventually force FG5 out of business and thwart its exercise of the ROFR.

**Defendants' Failure To Pursue Infringers**

61.    The License also provides that FG5 would be the exclusive licensee of the Mark in the Territory, which includes the entire North America.  In connection with the exclusivity, G.Mark agreed

> to refrain from using itself directly or directly through its licensees and manufacturers as well as through Aluc and any affiliates of [G.Mark] or Aluc, or granting third parties similar license, distribution or dealership rights on the Products in the Territory during the Term of [the License] as provided for by art. 3 and without limiting the foregoing,

14

shall not permit any third parties to utilize the Mark in connection with the operation of any retail stores within the Territory, nor operate nor maintain any retail stores in its own behalf utilizing the Marks in any manner within the Territory.  (Section 4.1)

62.    Pursuant to Section 7.3, upon receiving notice that a third-party is infringing FG5's exclusive rights, G.Mark "shall promptly be require to take all reasonable steps and actions so as to protect the Mark (including the possibility of bringing legal action as against any such infringer). "

63.    Upon information and belief, in breach of this obligation, defendants have allowed retailers named ShoptheFinest.com (via Amazon), Sartoriale, and Tiedeals.com to sell merchandise in the Territory.  FG5 believes that defendants have allowed other entities to breach the exclusivity as well.

64.    FG5 has notified G.Mark of the breaches discussed above on or about September 8, 2014.  Accordingly, G.Mark is required to "take all reasonable steps and actions so as to protect the Mark (including the possibility of bringing legal action as against any such infringer)."

## COUNT I
### (Breach of Contract)

65.    FG5 repeats and realleges the foregoing allegations as if set forth in full here.

66.    The ROFR Agreement is a valid and binding contract.

67.    The ROFR provides that in the event that Aluc decides to sell or transfer the Mark, "prior to entering into any such Transaction with any third party . . . Aluc shall provide [FG5] with a written agreement containing all of the terms of such Third Party Agreement," which FG5 can elect to "execute" within 60 days after its receipt "(subject to any further negotiations between the parties in good faith)."

68.    Aluc never provided FG5 "with a written agreement containing all of the terms of

15

such Third Party Agreement," despite repeated requests by FG5.

69.    Thus, Aluc had no right to sell the Mark to a third-party, because FG5's rights

under the ROFR Agreement were still intact.

70.    FG5 performed its obligations under the ROFR Agreement.

71.    Aluc breached the ROFR Agreement by accepting a binding offer to purchase the

Mark from Borrelli Ltd.

72.    As a result of Aluc's breaches, FG5 has suffered and will continue to suffer

irreparable injury for which money damages will be inadequate.

### COUNT II
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

73.    FG5 repeats and realleges the foregoing allegations as if fully set forth herein.

74.    The May 14, 2014 letter, which contained a "binding offer" from Borrelli Ltd.,

included "poison pill" provisions, failed to disclose more favorable terms offered to Borrelli

Ltd, and was designed to deter FG5's exercise of the ROFR.

75.    Aluc's negotiation and inclusion of such terms in the offer was done in bad faith,

for the purposes of depriving plaintiff of its ROFR.

76.    Accordingly, Aluc breached the covenant of good faith and fair dealing.

77.    Similarly, Aluc was contractually bound to extend the 60-day period to account for

further good faith negotiations between the parties.  After receiving FG5's offer which

substantially and materially matched the Borrelli Ltd offer, Aluc promptly rejected it and

refused to continue negotiations.

78.    As a result of Aluc's breaches of the covenant of good faith and fair dealing, FG5

has suffered and will continue to suffer irreparable injury for which money damages will be

inadequate.

## COUNT III
### (Permanent Injunction)

79.   FG5 repeats and realleges the foregoing allegations as if fully set forth herein.

80.   On July 15, 2014, Aluc accepted a binding offer to purchase the Mark from Borrelli Ltd.

81.   Upon information and belief, Aluc and Borrelli Ltd. signed the Deed of Assignment and related documents (although the parties disagree about the timing of such action) without providing FG5 with a proper opportunity to exercise the ROFR.

82.   FG5 does not have an adequate remedy at law.  Accordingly, defendants should be permanently enjoined from taking any further actions to complete the transfer of the Mark without complying with the ROFR Agreement.

## COUNT IV
### (Specific Performance)

83.   FG5 repeats and realleges the foregoing allegations as if fully set forth herein.

84.   Aluc has failed to act in accordance with the terms of the ROFR Agreement.

85.   As described above, Aluc failed to provide plaintiff an agreement containing all the terms of the transaction between Aluc and Borrelli Ltd, and granted Borrelli Ltd. more favorable terms than those described in the May 14 Letter.

86.   The signed Deed of Assignment made express references to, and its effectiveness was conditioned on, FG5's non-exercise of the ROFR. Thus, Borrelli Ltd. had actual notice of FG5's ROFR and thus was not an "innocent purchaser."

87.   Upon information and belief, no money has changed hands and the Mark has not

been transferred on any trademark registry.

88.     FG5 is also entitled to receive adequate due diligence before being obligated to exercise its ROFR to ensure that it is on the same footing as Borrelli Ltd.  For example, Borrelli Ltd. was provided with or had access to critical due diligence about G.Mark and Aluc.  Among other things, a Director and sole shareholder of Borrelli Ltd., Stefan Chiesa, is also a director of G.Mark.  Accordingly, Borrelli Ltd., before making its offer and signing the Deed of Assignment, had access to the information necessary to decide whether to enter into the transaction.

89.     Further, in recognition of the need for FG5 to have due diligence in connection with its potential acquisition of the Mark, on or about July 2, 2014, Aluc offered to provide FG5 with due diligence upon FG5's execution of a confidentiality agreement.  FG5was and is willing to sign such an agreement.

90.     As a result of the foregoing, FG5 is entitled to specific performance requiring defendants to transfer the Mark to FG5 on the properly included terms of the transaction between Aluc and Borrelli Ltd., after FG5 has been provided with adequate due diligence.

91.     FG5 has no adequate remedy at law.

## COUNT V
### (Breach of Contract Against G.Mark and Aluc)

92.     FG5 repeats and realleges the foregoing allegations as if fully set forth herein.

93.     G.Mark and Aluc have breached Section 2.3 of the License.

94.     G.Mark and Aluc also have breached the covenant of good faith and fair dealing.

95.     As a direct result of defendants' breaches, FG5 is entitled to money damages in an amount to be determined at trial.

## COUNT VI
### (Specific Performance of the Exclusive Rights)

96.   FG5 repeats and realleges the foregoing allegations as if fully set forth herein.

97.   G.Mark has breached Section 4.1 of the License.

98.   FG5 has no adequate remedy at law.

99.   As a direct result of G.Mark's breaches, FG5 is entitled to specific performance of Section 7.3 of the License.

## COUNT VII
### (Tortious Interference Against Borrelli Ltd.)

100.   FG5 repeats and realleges the foregoing allegations as if fully set forth herein.

101.   Borrelli Ltd. was aware of Aluc's contractual obligation under the ROFR Agreement to grant FG5 a right of first refusal.  In the Borrelli Ltd. offer, Aluc and Borrelli Ltd. agreed that the transfer of the Mark was conditioned upon FG5 not exercising its ROFR.

102.   Borrelli Ltd., in making an offer to purchase the Mark, colluded with Aluc to include in its offer "poison pill" provisions, designed to frustrate FG5's attempts to exercise the ROFR.  Moreover, Borrelli Ltd. failed to include in its written offer materially favorable terms to Borrelli Ltd, that Aluc had agreed to, in order to discourage plaintiff from exercising the ROFR.

103.   Borrelli Ltd. then negotiated and entered into the Deed of Assignment and related documents that contained more favorable terms.  As a result of these additional terms, Aluc was required to re-submit the terms to plaintiff before proceeding with the transaction.  Upon information and belief, Borrelli Ltd. knew of this obligation.  Nevertheless, Borrelli Ltd. entered

into the Deed of Assignment and related documents with Aluc, with full knowledge that these additional terms were never offered to plaintiff.

104.   Borrelli Ltd.'s negotiation and inclusion of the poison pill provisions in the offer, while failing to include the more favorable terms, which were then included in the Deed of Assignment and related documents, was done for the purposes of defeating the ROFR, and resulted in Aluc's breach of the ROFR Agreement and its obligations under the covenant of good faith and fair dealing.

105.   As a result of Borrelli Ltd.'s negotiations with Aluc and the offer it made to Aluc, Aluc breached its contractual obligations under the explicit terms of the ROFR Agreement and the implied covenant of good faith and fair dealing therein.

106.   Due to Borrelli Ltd.'s interference with the contractual relationship between Aluc and FG5, FG5 has suffered and will continue to suffer irreparable injury for which money damages will be inadequate.

## <u>COUNT VIII</u>
### (Contempt Against Aluc and Borrelli Ltd.)

107.   FG5 repeats and realleges the foregoing allegations as if fully set forth herein.

108.   On July 25, 2014, the Court entered a TRO, prohibiting Aluc and Borrelli Ltd. from entering into an agreement to transfer the Mark.

109.   The order was for FG5's benefit and FG5 has standing to complain about contemptuous violations thereof.

110.   Upon information and belief, in violation of that Court order, Aluc and Borrelli Ltd. signed the Deed of Assignment and related documents, *after* learning of the order.

111.   As a result of Aluc and Borrelli Ltd.'s violation of the Court's order, the Court

should hold these defendants in contempt and order appropriate relief for such contemptuous

conduct, including but not limited to punitive damages.

   **WHEREFORE**, Plaintiff FG5 requests judgment as follows:

   A.  On COUNTS I, II, III and VII, granting a permanent injunction enjoining the transfer of the Mark without defendants' compliance with the ROFR Agreement.

   B.  On COUNT IV, granting FG5 specific performance requiring defendants to transfer the Mark to FG5 on the properly included terms of the transaction between Aluc and Borrelli Ltd., after FG5 has been provided with adequate due diligence

   C.  On COUNTS V and VIII, granting money damages in an amount to be determined at trial.

   D.  On COUNT VII, ordering G.Mark to specifically perform its obligations under Section 7.3 of the License.

   E.  On all COUNTS, granting FG5 such other and further relief as the Court deems just and proper including costs, expenses and attorneys' fees.

MATALON ♦ SHWEKY ♦ ELMAN PLLC

By:  */s/ Joseph Lee Matalon*
       Joseph Lee Matalon

Of Counsel:

   Yosef Rothstein
   Yelena Rapoport

Dated: September 8, 2014